The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Craig H. D'Armond presiding. Morning, Counsel. The next case we'll call is 4-22-0238, N. Ray, the Estate of Blagden v. Matthew Dillon, M.D., et al. Could Counsel for the Appellant please state your name for the record. Yes, good morning, Your Honor. I'm Bruce Pfaff on behalf of the Estate of Dennis Blagden. Thank you, Counsel. Could Counsel for the Appellee please state your name for the record. Yes, Your Honor. Karen DeGrand on behalf of the Appellees, Dr. Kenneth Kroc, and Coleman Medical Associates. Thank you, Counsel. Mr. Pfaff, you may proceed. Thank you very much, Your Honors. May it please the Court, the issue before us is was there a special relationship between Dennis Blagden and Dr. Kroc so as to impose a legal duty on Dr. Kroc to act as a reasonably careful internal medicine specialist? Duty, of course, is a fact-sensitive determination. We have good examples from the cases that the parties have cited, and this Court has recently decided one similar, of where courts have decided that there either are or are not special relationships in a doctor-patient setting. A special relationship should be found here. The key facts in this case for the determination of special relationship come mostly from the depositions of Dr. Kroc, who was the physician on call for the Coleman Medical Group, and Dr. McMillan, who's the emergency medicine doctor, who was with the patient July 26 from roughly 7 p.m. till 9 p.m. At about three minutes to nine, Dr. McMillan phoned Dr. Kroc, who was the on-call physician for Coleman Medical Group. I think I've indicated before, Dr. Kroc was a specialist in internal medicine, and he had a contractual obligation to be on call, both from his physician agreement with Coleman Medical Group, as well as Coleman Medical Group's contract with the hospital. Some of the facts that I'll be going through, Your Honors, I do have specific page references if the Court needs them, but they're all in Volume 2 of the record. The emergency medicine doctor, Dr. McMillan, phoned Dr. Kroc to determine what the next appropriate steps would be for the patient care. Dr. McMillan called for advice from Dr. Kroc whether Dennis Blagdon should be admitted to the hospital. Dr. Kroc said he had no reason to doubt that was the purpose of the phone call, and that Dr. McMillan would be asking whether Dr. Kroc believed that Dennis Blagdon should be admitted. Dr. McMillan had the power to send Dennis away, to discharge him from the hospital and to have a treatment plan for outpatient care, without ever picking up the phone to call Dr. Kroc. This was not a clear-cut case to him, so that's why he made the phone call. Dr. McMillan had the authority to discharge someone from the emergency department without making such a call. He did not, as an emergency medicine doctor, have authority to admit a patient, and that is typical for most hospital arrangements. So clearly, Dennis Blagdon was in sort of a gray zone for Dr. McMillan. There is no evidence in this record that Dr. McMillan made up his mind as to what he felt should happen to Mr. Blagdon before he called Dr. Kroc. He wanted to present the case to Dr. Kroc. He presented it to Dr. Kroc and asked Dr. Kroc's decision. Clearly, Dr. Kroc said, and I'm sure Dr. McMillan agreed, that there would be a collaborative discussion about Dennis Blagdon, but ultimately, it's Dr. Kroc's decision whether to admit. Dr. Kroc has no memory of the phone call, no documents about the phone call, but did indicate that he had a regular practice of being on call, and that was what he was required to do under his agreement with a contract. Mr. Pfaff, can I ask you a question about that? Yes, Justice Doherty. There are certainly plenty of times emergency room doctors have to make a decision about whether to seek admission of a patient or whether to just go ahead and send them home, and plenty of times they send them home without consultation. Does that make them the decision to send the patient home, Dr. McMillan's alone? Under the facts of this case, no. If he had never made the phone call to Dr. Kroc and never presented the case to Dr. Kroc and never asked Dennis to be admitted, there wouldn't be a chart reference to say that there was discussion with Dr. Kroc and the patient was sent home, nor would Dr. Kroc be part of this case because the sole decision would have been Dr. McMillan. We know, however, from the depositions of those two physicians that it was Dr. Kroc's decision to send Dennis home. Dr. McMillan said he discussed all the lab results, Dennis's complaints, his symptoms, and the potential for infection. Ultimately, Dennis had an infection that went undiagnosed for three days, and that ultimately led to his death. But there were lab results that were discussed with Dr. McMillan, an elevated white count and an elevated sedimentation rate, that were indicators of potential infection. Dr. McMillan said he discussed those with Dr. Kroc and discussed the potential for infection with Dr. Kroc. Dr. McMillan said it was Dr. Kroc's call to send Dennis away for outpatient care only and not admit to the hospital. Pointedly, Dr. McMillan said the entire point of him calling Dr. Kroc was to discuss whether Dennis should be admitted. Emergency medicine doctors are jacks of all trade. They see trauma patients, they see kids, they see adults, they see all sorts of problems. Internal medicine specialists like Dr. Kroc have narrower practices and would have more expertise in dealing with someone like Dennis who had an infection. Now, as part of the hospital contract in this case, the doctors did provide on-call services. I'm sorry, the Coleman Group provided on-call services for the hospital, and they agreed to treat the patients as part of that agreement. That was all part of the comprehensive agreement where the hospital would pay Coleman Medical Group a fee for what are defined as medical and other services that are set forth in the contracts that are in the record in Volume 3. We would differ with the defense on some of the facts that are asserted in their brief. I would point out that the call that McMillan made to Dr. Kroc was not to discuss Dr. McMillan's plan for discharge. There's no evidence that Dr. McMillan had a plan for discharge when he made the phone call. He did not have a plan. That's why he called. Dr. Kroc did direct the care of Dennis Blagdon by saying Dennis should not be admitted and directing the outpatient care be provided. Dr. Kroc was asked to provide medical services for the benefit of Dennis Blagdon. Those medical services were to answer the key question in this case. Should Dennis Blagdon have been admitted to the hospital on that night? Dr. Kroc did suggest medical treatment for Dennis, which was go home, take the opportunity the next day to contact Dr. Bowers, who was listed as Dennis's primary care physician. There is no evidence in this record that I have been able to glean, and I've not seen a citation of evidence, whether or not Dr. Kroc did or did not bill for this phone call or whether his company did. Just to discuss briefly some of the cases that are critical, I think, to our determination. The first is this court's recent decision in Lewis. I would cite to paragraph 50 in that decision where the court said that a physician, patient, or special relationship may result when a physician is asked by another physician to provide a service to a patient, conduct lab tests, or review test results, and does so without ever having seen the patient. Clearly here we know the lab results were reported to Dr. Kroc, and he did make an evaluation of them. The court went on to say such a relationship is further established when a physician takes some affirmative action to participate in the care evaluation diagnosis or treatment of a specific patient, which of course Dr. Kroc did by listening to the story and deciding Dennis did not need to be admitted. The court finally said the central inquiry is whether the physician has been asked to provide a specific service for the benefit of a specific patient. Clearly the question that Dr. Kroc provided, his answer was should Dennis be admitted? He said no, turned out to be the wrong answer, but that was the service that he was being asked to provide by Dr. McMillan under the terms of his on-call arrangement. It was a formal arrangement established by contract, which would distinguish it from the Reynolds case, which I'll touch on in a moment. We've also cited the Slanger decision, which came down 12 days ago from the first district, is another case of a question about whether a patient should have been admitted from the emergency department or not. There, a nurse practitioner evaluated the patient and recommended that the patient be discharged from the ED. She had a supervising physician who approved that decision, and that was challenged. The supervising physician received summary judgment. The first district quite properly reversed that decision. The court noted in paragraph 25 that the doctor's evaluation affected the diagnosis and treatment of the patient, because that doctor was the one who decided the patient should be sent away from the emergency department. The nurse practitioner did not have authority to send the patient away. The doctor did. We've cited extensively in our opening brief the Mackey decision from the third district. Again, an emergency room doctor phones a urologist on-call pursuant to a contractual formal arrangement with the urology group to be available for emergency department calls. That doctor received information from the emergency department about how the patient was doing, what the results of a KUB showed, there was a large stone, there were other lab values that were reported to the urologist. The urologist did not admit the patient. The urologist suggested giving flownase, and the urologist suggested that he would see the patient on Monday. That urologist received a dismissal under 2619 that was reversed appropriately by the third district. The key facts of Mackey, which imposed a special relationship which are applicable to our case. There, the physician on the telephone at home, presumably the urologist, he was on-call pursuant to a contract with the hospital, just like here. He was consulted by the emergency room for the patient's benefit to render advice, just like Dr. Kroc. The urologist received information regarding the history, symptoms, and test results, just like Dr. Kroc. The urologist evaluated those and formed a medical opinion that the patient was not in danger and didn't need admission, just like Dr. Kroc. The urologist was responsible to decide whether to admit or not, just like Dr. Kroc. The urologist decided it was okay to discharge the patient from the ED, just like Dr. Kroc. Those factors are all listed in paragraph 17 of that opinion. I believe that we fit fairly within and fully within the Mackey case. We'd also cite the Bovaro case, a First District case where summary judgment was reversed. Doctors there reviewed angiogram films. They were interventional cardiologists. They reviewed them solely for purposes of saying, is this patient a candidate for angioplasty? Those interventionalists never saw the patient. They were asked by the treating cardiologist to review the films. They reviewed them and said the patient is an appropriate candidate for angioplasty. Their summary judgment was reversed appropriately because those doctors reviewed test results and interpreted them. That's exactly what Dr. Kroc did here. I'd cite to page 1030 and 1031 of that decision. Finally, I'd like... In this case, it would be correct, though, that Dr. Kroc was basically... Anything he reviewed would have been based on the oral report. Exactly. A little different than reviewing a film. Yeah, there was no film here in our case. Had there been a film, you could make a distinction by saying that Dr. McMillan could see the film and make a greater evaluation than Dr. Kroc, but there was no film to see here. There was just the lab values, which were rather critical, and the findings on the physical exam about not being able to move his neck. I point out the Reynolds decision on which defendant relies a great deal. We think is quite distinguishable. Reynolds, the patient, was already inpatient. The pediatrician was the attending. The pediatrician saw this unfortunate child, and the history was a little baffling. That pediatrician phoned a neurosurgeon at 2.05 a.m. and discussed the case briefly with him. The neurosurgeon on the phone was not on call. He did not have a contractual arrangement with the hospital or anyone else to be on call. He was providing an informal service to his colleagues by answering that call. Importantly, at the end of the call, he told the pediatrician. His advice during the call to the pediatrician was, if you want to work this up further, get a lumbar puncture. He also said, and the pediatrician acknowledged, if you need my further involvement, contact me and let me know and do a formal consultation. The pediatrician never was able to get that result to the doctor. Apparently, the pediatrician wished to have the neurosurgeon brought in on the case. Whatever documentation she did was not transmitted. The neurosurgeon never heard further other than that initial phone call. The court appropriately granted summary judgment to that doctor. It was Dr. Fulbright. He was not asked to provide any specific service for the patient. He only answered the inquiry from the patient. The appellate court there and subsequent courts have all categorized the cases. The neurosurgeon was being asked for simply an informal opinion to a colleague as opposed to having any contractual arrangement like here to make a decision for a patient. How are the policy concerns that were discussed in Reynolds applicable here or not applicable here? The idea that we want physicians to feel very free to give telephone advice, these curbside consults. Is that implicated in this case? I think it's important in every setting to allow professionals, be they doctors, lawyers or otherwise, to communicate to one another either formally or informally. I think the setting has to be always considered. In our case, we have a 9 p.m. phone call to Dr. Crock who's on call, who's supposed to be on call and has a duty to be on call to answer questions just like this. Dr. Fulbright in the Reynolds case, 2 o'clock in the morning, he's not on call for anyone and he picks up the phone because he's a diligent doctor and answers the call. I think there's a huge distinction to understand the context in which those calls are made and those decisions are made. In this case, I'm sorry, in the Reynolds case, that doctor didn't see any data, didn't see any test results and just had an informal phone conversation. It is a different setting and clearly Dr. Crock and Dr. McMillan understood it was a different setting because it was Dr. Crock's decision under their relationship to decide if Dennis should be admitted or not. In the Reynolds case, the patient was already in the hospital. That's really neither here nor there because the particular decision in this case is about admission, but that's not the relevant factor in deciding whether a case is precedential. I see your honor's point. If I can conclude, your honors, I don't want to overstay my welcome. Dr. Crock did perform a specific service for Dennis Blagdon's benefit. He decided not to admit Dennis. He okayed the discharge from the emergency department for follow-up on outpatient care. That's the decision we're challenging in this case as being medically inappropriate. Dr. Crock understood his role was to decide to admit or not and Dr. McMillan understood that. Unfortunately, there's no further documentation other than the brief note in the chart and Dr. Crock doesn't recall more, but he understood by context he was being asked to decide whether Dennis should or should not be admitted. It was on his decision that Dennis was not admitted. Dr. Crock did not merely rubber stamp some purported decision by Dr. McMillan. That was argued below at the hearing in the motion for summary judgment, but there's a false premise there. Dr. McMillan had no decision beforehand that Dennis should not be admitted and Dr. Crock wasn't there to be a rubber stamp. He was there to be the one to decide whether he should be admitted or not. Dr. Crock did not casually consult with Dr. McMillan as the defendant argued unsuccessfully in the Lewis case and as was part of the Reynolds decision. The facts here show that Dr. Crock owed Dennis Blagdon the legal duty that his decision to discharge and not admit be made with reasonable care. Summary judgment in this case should be reversed and the case remanded for trial on the merits. Thank you, counsel. You have an opportunity on rebuttal. Thank you. Ms. DeGran. Thank you, Your Honor. Again, Karen DeGran on behalf of the appellees, Dr. Crock and Coleman Medical Associates, may it please the court, counsel. There was a fair amount of discussion about the Lewis case, so I think given that, I'll start with that decision because it truly supports the defense position before the court, whether a special relationship formed between Dr. Crock and Mr. Blagdon during that brief telephone call minutes before Dr. McMillan discharged Mr. Blagdon home from Graham's emergency department. And there are important differences between Lewis, which is very helpful because it's this court's very recent framing of the issues, framing of the test. But the mantra, as it were, of plaintiff's counsel today is based on an inaccurate description of Dr. Crock's obligation. He did not have a contractual requirement to make a decision. I repeat, he did not have a role to decide whether to admit or not. And that's an important distinction that I think. How is it that he had no obligation or no role in making a decision to admit when up between the two of them only he could admit? Well, so here's the distinction I'm making, Your Honor. And that is that he, in the sense, and this was the testimony both of Dr. McMillan and Dr. Crock, in the sense that Dr. Crock, if there was a decision to admit, would be the admitting position. Yes, technically, that's a decision, but it was, there is nothing in this record that says it was Dr. Crock's determination to send the patient home. And that's an important distinction here. It is, but we're sort of dealing with two sides of a coin. There's only two outcomes. That patient can either be sent home or admitted.  And McMillan owned one half of that decision. He could actually send the patient home, but Dr. Crock owned the other half. And they've described their decision as collaborative. So how is it that that decision that they've themselves described as collaborative, in your mind, only belongs to Dr. McMillan? This is how I view it, Your Honor. Baking up for a second to Dr. McMillan said, and this is at page 72 of his deposition transcript, and it appears in a number of places in the record. But the one that I'm looking at right now is page 44 of Volume 3 of the Common Law Record. And he says that in his deposition, at the point that he decides, and he's already done the testing and the examination and looked to see if any medication was helping. I think either admit to the hospital or arrange for appropriate follow-up. So he's got the thought, we're going to do one of those two things. But we all know that. We knew that before we read the deposition, because we know those are the only two outcomes. Right. But to suggest that, and this is one of the factual statements that I take issue with, that was offered by Mr. Paff, is that almost as though he had no say in whether the patient is admitted or is discharged. Dr. McMillan certainly, Dr. McMillan could have gotten off the phone after talking with Dr. Crock and said, yeah, gee, I don't know. I'm not saying it happened this way, but theoretically, he thought that there should be admitted. And now I'm looking at Mr. Blagdon again. No, I'm sending him home. And there is nothing that would have stopped that outcome. And that is because it's not correct to characterize either his testimony or the medical record or Dr. Crock's testimony as saying that it's up to Dr. Crock to send the patient home. Counsel, that begs the question of what the actual facts were. Yeah, that's a possible alternative set of facts. But as Justice Dougherty pointed out, you could only get to the door of admission through Dr. Crock. It couldn't happen any other way. But he would have to be the admitting physician and then Dr. Bowers would have been the attending likely if that had happened. But Dr. Crock was absolutely adamant that he has never in his 29 years in his role as an internist and pediatrician gotten a call like that and said, no, send him home. That's not what his role is as the on-call physician. I mean, and the facts of this case are in this particular context, Dr. McMillan, he does everything that needs to be done. And it seems to me to be under, you know, almost disregarded possibly the most important fact here, which is that Dr. McMillan was the physician who actually examined the patient. You know, Dr. Crock was very clear, and there's nothing to, there's no aspect of the record that disputes this, that he would not in the position as taking a telephone call at night from a doctor who is especially a seasoned physician like Dr. McMillan, who not only was an emergency room doctor, but an experienced family practice physician. He doesn't have, Dr. McMillan has no superior expertise in making a decision whether this patient should be admitted. But that's not also the factual scenario here either. It's not as though McMillan called and said, I want to admit this patient. Summarily, here's what's wrong with him. We all good? No, he gave him a full set of information, sought his agreement on that, and his advice on that. It's not as though Dr. Crock was a rubber stamp, right? I wouldn't characterize a rubber stamp, Your Honor. What I would say is, however, that it was not up to, you know, Dr. Crock's role in this, you know, in the conference that he had in this discussion was not to say, not to override any suggestion that Dr. McMillan might make about, you know, I think it's, I think it's fine to send him home. As long as he sees follow-up first thing tomorrow. And that was, and everybody agrees with that, that that was absolutely, Dr. McMillan, it was absolutely adamant about that. What he seemed to be looking for, for he was, I think it's correct to characterize and fair to characterize the record as he calls Dr. Crock because he wants to make sure there's going to be a follow-up. He knows that Dr. Crock is part of the group that is Mr. Langdon's primary care physician, and he wants to run by him the scenario and see if he has, you know, some other idea. That makes it sound like the call was about the terms of discharge when it sounds from what McMillan said, the question was whether to discharge versus admit, and he hadn't himself decided on that until he talked to Dr. Crock. And he, and he, he doesn't say that he had decided that already. I agree with the court on that point. But, but, you know, the, what Dr. McMillan said was when he, he gives that testimony of, you know, ultimately, I'm looking for Dr. Crock to make a decision and then clarifies that testimony by saying, to the extent that he would have to be the admitting physician. And that, and Dr. Crock gave similar testimony that it's not, it's only, you know, it can only be characterized technically as his quote unquote decision from the standpoint of, yes, he has to be the person to be the admitting physician. But that doesn't mean that it's not fair to characterize that as a decision that, yes, he himself is the one who directed that this patient be sent home. So rather than rather than try to divide the decision, why don't we look at it the way the doctors described it as collaboratively. Why is only one doctor involved in, in, in that decision legally right why why is there only one of them that bears a relationship with the patient. Well, I, you know, I go to this course decision in Lewis, Your Honor, and to the way that the court articulated the, the test of special relationship. The, the, the court specifically looked at the fact and emphasize the fact that, you know, we have a supervising attending physician who was affirmatively involved. But that's, that's, that was the resolution of that case that wasn't stating this is the rule for how you establish a relationship. The facts were different because it was a supervisor and an underling. Correct. I agree with that. And that is, that was, was how there was a specific service provided. And, you know, that those facts showed what is relevant here, which is the extent to which the, the physician whose care was was being looked at. Was he directing the care of the patient. Dr. Well, let's, let's go back to Lewis. I don't think there was anything showing that he directed the care but what he did have was the authority to redirect the care. If he agreed with the plan of action, and that authority came as a result of his role under hospital policies. Aren't those two factors present here as well. I don't, I don't think they are your honor. And for the reason that while Dr. Yeager would be responsible as the attending physician and as a supervising physician to determine whether the resident who did not have autonomy, much unlike Dr. whether those that was the correct correct course of care. He had to say yes or no, no matter what the decision was. And that is very unlike Dr. The situation with Dr. Crock and Dr. MacMillan here. By contrast to that situation again where the resident who would have to say yes or no to the decision at issue in the case, which is admission. Well, your honor, I would just I would frame that a little bit differently. And that is, he, he. We've got two physicians equally qualified I think the record shows with decades of experience pertinent to this care that Mr. needed conferring about this. Right. And one of them had the authority to admit and the other one didn't. But you want the decision to be made. You want the responsibility for the decision to be only the physician who didn't have the response or the authority to make it. But Dr. But the I disagree with the way the court is framing that simply because Dr. MacMillan had the authority to discharge the patient, regardless of what Dr. Crock would say. Correct. But there. I mean these back to that flip of a coin here. If you're not if you're discharging him you're not admitting him if you're admitting him you're not discharging it, I don't know that we can separate those into two different things and when the physicians tell us that was collaborative. Why aren't we listening to him. Because, because what we have here is that if Dr. MacMillan wanted to admit the patient. And this is clear from Dr. Crock's testimony. Dr. Crock said I would never disagree with that. I have never disagreed with that in 29 years in this kind of situation where I'm getting that call right but if he if he got that call it would have been his order to admit the patient. It would have been he would have been signing the order, but it wouldn't be his decision. He would be it's his decision only in that he is making. He is the admitting physician, right, like the supervising physician in Lewis, it, you know, he, it was, it was the workup of the student. And he just signed off on it, but that still created the relationship. But I have to disagree with the court that it's analogous for the very important reason that Dr. Toe in the Lewis case had did not have the autonomy that Dr. MacMillan had Dr. MacMillan, he, he could have disregarded everything that Dr. Crock is brought in, in terms of, you know, there's a collaboration, but in terms of decision making. He, it is not his sole decision in terms of a recommendation about what to do, he's conferring with Dr. Jaeger in the Lewis case, who he is required to say yes or no to whatever Dr. Toe does. That's not the situation with Dr. MacMillan, and Dr. Crock, Dr. Dr. MacMillan can say he doesn't first of all he doesn't have to call him that's one of the ways we know this case is different. I'm sorry you're on you look like you're about to ask me a question. No, no, you're good. Okay. He doesn't have to call him at all. And when he, when he does discuss the situation with him. He doesn't have to take his advice. He's not the one who's making a decision, and it's the technical aspect of Dr. Crock having admitting privileges, I think, is beside the point, because he wasn't admitted. And, and if just to say that it was, and I know you're, you're, you're finding a legal duty, based on an outcome, versus the facts that were present at the time, the decision was being made, and your own client acknowledges that this was a collaborative decision. He doesn't say no, wait a minute. I just told him what I thought about the test results. And he was going to decide whatever happened to the patient. He's being called not just for medical information and assistance because like Justice already pointed out, he got all the lab results he got tests he got all that information. And then the decision is going to be made as to whether he gets admitted or not. And your client is the only avenue by which this patient can be admitted. It doesn't it's not what's not relevant to this argument is, well, he could have done this or he could have done that what's relevant is what did they do at the time they were collaborating. Did that then create the duty. It seems like your argument is based primarily on that what the outcomes might or could have been, and that that somehow establishes a duty, I have a problem with that. Well, let me see if I can articulate my position in a, in a clearer way, or a way that's more satisfactory to the court. What we do know and this is not not pointing at, at the result is that at the time of this telephone conversation. We know that Dr. McMillan had thoroughly done all of the work up. He reaches his conclusions about the more likely diagnosis, that's in the record volume two of the sealed record at page 328. The more likely diagnosis being torticolous rather than some sort of infectious process. He has looked at the test results and made his interpretation of them, he has, you know, he's got his you know quote unquote hands on the patient. And he's had the opportunity to give the patient, some medication and see what effect that it has on the patient. And this is all fully supported by the medical record as well as Dr. McMillan's testimony. So, once he sees the, he sees the test results. He doesn't, he doesn't necessarily. He doesn't, they don't strike him as showing necessarily an infectious process, and that's where he's making this okay. Follow up with go home and follow up the next morning, or be admitted. And so, Council so you stop you stop right there with everything you just told us, the doctor McMillan is unsure as to which direction. He's going to go and in the context of a contractual obligation payment, and the ability to make admissions. Where do you go from there. Once there's you agree there's a collaborative process. Well, I, so there's a couple of questions included in the course comments. He's, you know, this is not a situation where there's a formal order for consult I think we all agree with that Dr. McMillan didn't send an order to infectious disease for an expect infectious disease consultation, pursuant there to pursuant to a cop to a contract required is there to provide on call services, but there's nothing in that contract that says there is payment for that particular telephone call, or even payment is linked directly to on call services. That's just part of the arrangement between the hospital and the Coleman medical group for the Coleman medical group to have privileges at the hospital. And one of the things that they do is to take the call but it's not, it's not stated anywhere in that contract or anywhere in any deposition or other evidence that's before the court that that required, or even gave Dr. Crock the ability to say, I'm the person who is directing this care. I'm the person who's sending this person home. It's just, it doesn't say that anywhere in that contract so we don't get if he says I'm not, if I'm not admitting him. That's effectively saying I'm sending him home, but he, he didn't there's nothing in the, there's, there's nothing in the record that says he's the person who said, I'm not admitting him. It is, it's, there's a discussion that that is made, and even, and you know to the extent that that Dr. McMillan has characterized it well, you know, we have this conversation and, you know, he gives his, his impression of the test results it's not like some of these other cases where, where the physician who's in questions is actually looking at an I tried to give you a little additional time to respond to Justice Doherty's question, but I think we've gotten past that your time is up, you will have an opportunity. Well no you won't. Sorry. I think the court for its time, and, and we, you know, respectfully request that the court enter in order for me the trial courts. Thank you, Mr fab rebuttal. Yes, Your Honor, I want to take issue with counsel's hypothetical. The hypothetical being that conversation occurs and crack decides this patient ought to be admitted. And her hypothetical is well that Dr. McMillan can reconsider and Dr. McMillan can send the patient away. There is no basis in the record for that comment, none at all. And I think it's it's absolutely insane to imagine the idea that McMillan calls for help, he gets help, he gets advice to admit, and he's going to disregard it. One I don't think he has the power to countermand an order from an attending doctor to admit a patient. And number two, it's irrational to suggest he would ever do so. So, I don't think that hypothetical should be part of our case at all. I don't think that they're equally qualified doctors they may be a similar age but there are different backgrounds and different specialties. I would expect an internal medicine doctor to have far more sophistication on infectious processes that may be brewing and Dennis's spine like he did, then an ED doctor, not to denigrate them but they have a broader scope and a narrower depth than an internal medicine doctor. I would point out again in volume two. Ultimately, it's Dr Croc's decision to admit. McMillan told us that page C49 specific pages 92. That's part of this record it's Croc's decision to admit. And again, the flip side of that is just a story quite well put it. The flip side of that is you go home. It's, it's a binary decision from the emergency department. There is no dispute that McMillan, the purpose of his call was to ask Croc if Dennis should be admitted, and it was Croc's decision. Again, same page reference 9192 of that record. As I think. Justice Kavanaugh pointed out, it doesn't much matter if. If you say, crack has no duty, when you look at McMillan's uncertain crack is there to answer the question, and it's a collaborative process. Anyone who's tried cases knows that if Dr Croc is not part of this trial, there is a giant empty chair sitting in this courtroom. And the idea that two doctors collaborate on a decision, and the decision is reached to send the patient home. If the only guy who could have kept the patient in the hospital is not part of this case. This court has sounded the death knell for this case. So the, the idea that a collaborator in a decision that's critical for the patient can't be held to have a special relationship is not appropriate. There is a brief record reference that was discussed in Dr McMillan's deposition, suggesting, or describing this conversation it's about eight words, and it mentions the discuss the case with Dr Croc patient okay for discharge. Well, the fair inference for that is that the two of them collaborated, and that Dr Croc said it was okay for discharge. Your Honors, I have nothing further to add, only to again request that the summary judgment be reversed and the case remanded. All right, thank you counsel this court will take the matter under advisement, the court stands in recess.